264 P.2d 691

**HOWAY v. HOWAY.**
No. 7960.

Supreme Court of Idaho.

Dec. 17, 1953.

Elam & Burke, Boise, for appellant.

Hawley & Marcus, Boise, for respondent.

TAYLOR, Justice.

The parties were married June 21, 1922, at Seattle. In January, 1942 they moved to California, residing at San Mateo until July 28, 1950, when the plaintiff separated from the defendant and moved to Boise, Idaho.

Plaintiff brought this action for divorce on the grounds of extreme cruelty. The acts and conduct alleged and testified to by the plaintiff were for the most part denied or minimized by the defendant in her testimony. Thus issues of fact were presented to be determined by the trial court, the trier of the facts. Under our rule, there being sufficient substantial and competent evidence to support its findings thereon, and the findings not being clearly against the weight of the evidence, the findings of the trial court are binding on this court and will not be disturbed.

"The trial judge is the arbiter of conflicting evidence and his determination of the weight, credibility, inferences and implications thereof is not to be supplanted by this Court's impressions or conclusions from the written record." Sellars v. Sellars, **73** Idaho 163, 248 P.2d 1063, 1064.

494

The evidence is ample to support the findings briefly summarized as follows:

Commencing in the year 1937 the defendant became dissatisfied with the standard of living which the plaintiff was able to provide for his family and thereafter frequently, continually and habitually criticized, bickered and carped at plaintiff about his inability to provide a larger income; humiliated and embarrassed him in the presence of strangers and friends by belittling his earning capacity, and making unfavorable comparisons with her brothers, and others; that she complained to his employers about his salary, causing him to quit one job and to be discharged from another. After she had become engaged in real estate speculation in California, with money inherited from her father's estate, she made unfavorable comparisons before strangers and friends of his business ability and earning capacity as against her own; after he was discharged by his last employer in California and the parties jointly engaged in a real estate and insurance business at San Mateo, the defendant continuing the same course of conduct, humiliated and embarrassed the plaintiff by statements to employees and others that she furnished the money to set up the business, that she was the manager and would make the decisions; she bought two homes, one in part from an advance on her inheritance and the other in part from her separate funds, which the plaintiff considered too expensive for his earning capacity, and which caused him considerable embarrassment with his employers and fellow employees; because of this continuous course of conduct and the resultant humiliation and embarrassment the plaintiff suffered great mental anguish, and such worry and distress that on two occasions he was afflicted with stomach ulcers, on one of which occasions, in the summer of 1946, he was confined for a period of some weeks in a sanitarium because of an attack of ulcers and a nervous breakdown; plaintiff could not dissuade her from continuing to pursue her business career to which she constantly devoted more and more time, to the neglect of the home, and that following the humiliation which she inflicted upon him in the conduct of the joint real estate and insurance venture, and her plans to engage in the development of a large subdivision, the plaintiff left the defendant and moved to Boise, where he accepted employment which had been previously offered him.

The defendant, seeking a decree for separate maintenance, alleged extreme cruelty on the part of the plaintiff. In her behalf the evidence would support findings to the effect that the plaintiff left without notifying the defendant of his intention to do so and without telling her where he was going. In this connection, the evidence is that in 1949 plaintiff advised the defendant of the offer which he had received from Boise to become the manager of an insurance agency there, and that

he intended to accept it. But she refused to move from San Mateo. The defendant's chief reliance for recrimination, however, is based upon plaintiff's attentions to and associations with another woman.

It appears from the record during the year 1949 and the fore part of 1950, the plaintiff made frequent calls upon this other woman in San Mateo, he claiming that the calls were in connection with his handling of her insurance business and the rental of an apartment owned by her, and negotiations with the rent control authority which he carried on as her agent. She came to Boise, Idaho, at his request in November, 1950, and there he lived in the same house or apartment with her and they took several trips together to different points in the state; that this woman represented him to the landlord as her brother. The plaintiff insists, however, that there were no intimate or unlawful relations between himself and the other woman, and none is charged, although suggested, by the defendant.

The trial court found that the defendant had failed to support the allegations of her cross-complaint, that the plaintiff had inflicted a course of cruel and inhuman conduct upon her, causing her mental and physical suffering. The defendant, appellant, assigns as error the failure of the trial court to make specific findings upon the allegations of the cross-complaint, and that the relationship between plaintiff and the other woman were sufficient to entitle her to a judgment for separate maintenance, and sufficient to establish the affirmative defense of recrimination. The facts as to the relationship between the plaintiff and the other woman being largely admitted by the plaintiff, may be taken as found by the court, hence the finding which the court did make was in effect its conclusion that these facts do not establish extreme cruelty or recrimination. Therefore, assuming the facts admitted by the plaintiff as findings, the question then arises as to whether or not the conclusion reached by the court is sustained by the record.

Our law provides that a divorce "must be denied upon showing: * * * Recrimination; * * *." § 32–611, I.C.

"Recrimination is a showing by the defendant of any cause of divorce against the plaintiff, in bar of the plaintiff's cause of divorce." § 32–613, I.C.

In Morrison v. Morrison, 38 Idaho 45, 221 P. 156, this court speaking through Mr. Justice Budge, said:

"While it is true that respondent did not at all times conduct herself in such a manner as becomes a wife and mother, such acts and conduct upon her part were not of such a character as would justify the acts and conduct of the appellant as found by the trial court and sustained by the evidence, neither were such acts and conduct upon her part the result of her own initiative, but

rather the result of the acts and conduct of the appellant. The rule seems to be that, where recrimination is relied upon as a defense, that one spouse, although guilty of misconduct not such as would support a decree of divorce, will not be denied the divorce where the other spouse is guilty of such cruel and inhuman treatment as justifies the court in dissolving the marriage status. In other words, mere indiscretion, although reprehensible, does not amount to recrimination." At page 51 of 38 Idaho, at page 158 of 221 P.

We might rest the decision here upon the authority of the Morrison case, but it is justifiably urged that plaintiff's conduct was such as to entitle defendant to a divorce and therefore is a complete bar to his cause. Undoubtedly many divorces have been granted upon such a showing, where it was also shown that the complaining party knew of the association of her spouse with such third person and suffered cruelty by reason thereof. Parsons v. Parsons, 72 Idaho 455, 243 P.2d 973. Here there are other considerations to be weighed. While these parties were living at San Mateo, the defendant had little, if any, knowledge of any association between her husband and the third party. There is nothing to indicate that she suffered any mental anguish by reason thereof. She testified that friends told her of it after plaintiff had left, and she was then very much upset. The record supports the finding of the court that her conduct, upon which plaintiff bases his cause for divorce, was in no way induced, provoked, or contributed to by his attentions to any other woman. The trial court found that the separation was caused by the "continuous nagging, criticizing and badgering of the plaintiff by the defendant" and

"That the constant, continuous, and determined nagging, criticizing and belittling attitude and acts of the defendant and cross-complainant toward the plaintiff and cross-defendant over a long period of years destroyed the legitimate objects of matrimony between the parties, and was calculated to and did constitute extreme cruelty to the plaintiff and cross-defendant."

We do not infer that conduct of the plaintiff subsequent to the separation and subsequent to the filing of the action for divorce may not be relied upon by the defendant as a recriminatory defense. However, the conduct of the plaintiff after the separation could in no case be a defense on the ground that it provoked the cruelty charged against the defendant as the cause of the separation and ground for divorce. Hence, we are here limited to a consideration of the sufficiency of such conduct to bar plaintiff's cause on the ground of recrimination under the statute.

The doctrine of recrimination is said to be based upon the equitable precept that he who comes into equity must come

with clean hands. But, it cannot be compared to that precept if it must be applied mandatorily by the divorce court in every case where improper conduct on the part of the plaintiff appears, without regard to consequences or other considerations having an equal claim upon the conscience of the chancellor. Equity has always regarded itself free to apply or refuse to apply the maxim in a particular case, depending upon the consequences and a due regard for other considerations involved.

"The clean hands maxim has its limitations. It does not operate so as to repel all sinners from a court of equity, nor does it apply to every unconscientious act of a party. * * * equity will consider the conduct of the adversary, the requirements of public policy, and the relation of the misconduct to the subject matter of the suit and to defendant." 30 C.J.S., Equity, § 98.

In Stewart v. Stewart, 158 Fla. 326, 29 So.2d 247, 248, 170 A.L.R. 1073, where the misconduct by both parties was established, including adultery on the part of plaintiff, the court referring to recrimination said:

"It is not an absolute but a qualifying doctrine. If it were to be applied strictly great inequity would be done, for it so often happens that neither party to a suit has been free from fault. * * *

"The principle is most applicable when a party seeks to take advantage of an act or omission which he has himself induced."

The annotation to the Stewart case, 170 A.L.R. 1076, calls attention to the trend toward relaxation of the doctrine of recrimination and the underlying reasons prompting the courts to take that course. The trend which the annotator said was not "marked" at that time, 1946, has since had considerable expansion.

"There was some testimony produced by respondent as to alleged intimacies of libellant with one Mrs. Boyer. They were not connected in any way with the allegations in the libel, and were subsequent to the acts of indignities which would sustain the libel. The alleged conduct of libellant occurred after libellant and respondent had separated. The cause of divorce had fully accrued prior to libellant's alleged misconduct, and it did not provoke the indignities of which he complains. The doctrine recognized in Ristine v. Ristine, 4 Rawle 460, Mendenhall v. Mendenhall, 12 Pa.Super. 290, and Fay v. Fay, 27 Pa.Super. 328, 336, is applicable to an action in divorce based on indignities to the person, and libellant's alleged adultery, committed after his right to a divorce had accrued, would not be cause for refusing the divorce." Clark

**v.** Clark, 160 Pa.Super. 562, 52 A.2d 351, at page 353.

Followed in Spence v. Spence, 167 Pa. Super. 248, 74 A.2d 495, and Orsuto v. Orsuto, 171 Pa.Super. 532, 91 A.2d 284.

"Wife's engagement to another man during the six-month period prior to final date of divorce decree and her show of affection toward such man did not constitute such misconduct as would cause wife to lose right to absolute decree, where there was no showing of any misconduct on wife's part that would indicate moral depravity or that wife was unfit custodian of minor child." Syl. 8, Curtis v. Curtis, 330 Mich. 63, 46 N.W.2d 460, 461.

"To affirm that a guilty spouse is never entitled to a divorce is a position difficult to apply to the facts of life. It is seldom, perhaps never, that any wholly innocent party seeks a divorce against one who is wholly guilty. Awareness of this fact and the giving of attention to the social implications of divorce has given rise to various exceptions and limitations on the doctrine of recrimination." Hendricks v. Hendricks, Utah, 257 P.2d 366.

In Pavletich v. Pavletich, 50 N.M. 224, 174 P.2d 826, at page 832, where the court held adultery by the plaintiff after the separation immaterial, the court said:

"* * * where the parties are irreconcilable we believe that the public policy of this state as expressed by the legislature, is against denying a divorce on the doctrine of recrimination. Chavez v. Chavez, 39 N.M. 480, 50 P.2d 264, 101 A.L.R. 635, in so far as it holds it to be the imperative duty of the chancellor to deny a divorce upon a showing of recrimination, should no longer be followed."

Cf. Clark v. Clark, 54 N.M. 364, 225 P.2d 147, 21 A.L.R.2d 1263. See also Schouler Divorce Manual, Recrimination, § 180; Lassen v. Lassen, 134 Kan. 436, 7 P.2d 120; Weatherspoon v. Weatherspoon, 195 Ore. 660, 246 P.2d 581; McFadden v. McFadden, Tex.Civ.App., 213 S.W.2d 71; Hokamp v. Hokamp, 32 Wash.2d 593, 203 P.2d 357.

In some jurisdictions divorce is granted to both parties. Flagg v. Flagg, 192 Wash. 679, 74 P.2d 189; Simmons v. Simmons, 122 Fla. 325, 165 So. 45; Burch v. Burch, 3 Cir., 195 F.2d 799.

The opinion in Burch v. Burch, supra, contains an excellent review of decisions involving recrimination. We quote:

"The doctrine of recrimination has been rested upon the equitable maxim that he who comes into equity must do so with clean hands, upon the doctrine that divorce is a remedy for an injured spouse, not for a guilty one, and upon the contract theory that he

who seeks redress for the violation of a contract resting on mutual and dependent convenants must himself have performed the obligations on his part. But the doctrine of recrimination in divorce has been much criticized in recent years. For it ignores the fact that marriage is not a mere private contract but rather a status of such basic importance in the social structure that the state has a vital interest in its proper continuance and appropriate termination. From a social point of view it is hard to defend the rule that recrimination is an absolute bar to the granting of a divorce for it requires that parties who are guilty of conduct which makes their marriage impossible of success shall continue their impossible marital relationship as a sort of punishment for their mutual guilt. For this reason the application of the doctrine has been relaxed as an absolute bar to divorce in a number of jurisdictions." At page 809, of 195 F.2d.

Our statute on recrimination appears to be mandatory in its terms except for the phrase "in bar of the plaintiff's cause of divorce." If by this the legislature left to the court the determination of when a recriminatory defense is established so as to bar plaintiff's right to a divorce, then recrimination, like clean hands, and the mutual dependent covenants of contract doctrine, would allow equity to have regard for the public interest and the consequences to the parties and others in its application.

The California statute on recrimination is the same as ours. In DeBurgh v. De-Burgh, 1952, 39 Cal.2d 858, 250 P.2d 598, 601, the supreme court of California reconsidered the previous decisions of the courts of that state and reversing the decision of the district court of appeal, 240 P.2d 625, and specifically disapproving five of the previous decisions in that state, reached the conclusion that recrimination is not an absolute bar. We quote at some length from that decision because of the identity of the statutes considered to our own.

"The deceptive analogy to contract law ignores the basic fact that marriage is a great deal more than a contract. It can be terminated only with the consent of the state. In a divorce proceeding the court must consider not merely the rights and wrongs of the parties as in contract litigation, but the public interest in the institution of marriage. The family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people. Since the family is the

core of our society, the law seeks to foster and preserve marriage. But when a marriage has failed and the family has ceased to be a unit, the purposes of family life are no longer served and divorce will be permitted. '(P)ublic policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been utterly destroyed.' * * *.

"The chief vice of the rule enunciated in the Conant case is its failure to recognize that the considerations of policy that prompt the state to consent to a divorce when one spouse has been guilty of misconduct are often doubly present when both spouses have been guilty. The disruption of family relationships, the clandestine associations with third parties, and the oppressive effect upon children and the community are intensified. It is a degradation of marriage and a frustration of its purposes when the courts use it as a device for punishment. * * *

"Although the plaintiff's fault has always been regarded as an important element in the decision of any case, our courts have traditionally refused to exalt that element above the public interest. * * * This respect for the public interest has formed the basis of a recognized exception to the equitable doctrine of unclean hands, with which the defense of recrimination has become increasingly identified since the enactment of the Code. It is clear that the Legislature in relying upon judicial principles of general application, intended that in divorce litigation the fault of the plaintiff should have no more significance than elsewhere in the law. Apparently with this purpose in mind it worded the statute to require that a cause of divorce shown by defendant must be 'in bar' of the plaintiff's cause of divorce. It would have defeated its own purpose had it closed the avenues to divorce when the legitimate objects of matrimony have been destroyed. The perpetuation of an unwholesome relationship would be a mockery of marriage. * * *

"In other fields, equity does not deny relief on the ground of plaintiff's unclean hands when to do so would be harmful to the public interest. * * *

"Among these are the prospect of reconciliation and the interests of the children of the marriage. In keeping with the traditional view of the law toward both marriage and divorce, the Lord Chancellor states that the consideration of 'primary importance' is the interest of the community at large. This interest is 'to be judged by maintaining a true balance between respect for the binding sanctity of mar-

riage and the social considerations which make it contrary to public policy to insist on the maintenance of a union which has utterly broken down.'

* * *

"* * * the doctrine of recrimination, like the doctrine of unclean hands of which it is a part, is neither puristic nor mechanical, but an equitable principle to be applied according to the circumstances of each case and with a proper respect for the paramount interests of the community at large." DeBurgh v. DeBurgh, 39 Cal. 2d 858, 250 P.2d 598, at pages 601–605. Followed in: Noble v. Noble, 115 Cal.App. 2d 786, 252 P.2d 1001; and Kirsch v. Kirsch, Cal.App., 259 P.2d 444.

The proposition is universally accepted that the state has a paramount interest in marriage and divorce. The family unit, constituting as it does the very base of our religious, cultural and moral life, is one of the principal supporting pillars of our civilization. The state created by the people for the protection and promotion of their common welfare, must protect and foster marriage and the family relationship. However, the state is not the author of man. It cannot alter basic biological or other characteristics endowed by a higher authority. Any attempt to do so, or to ignore or suppress the fundamentals of human nature, dooms the regulation to failure and defeats its purpose. The result is often a train of unanticipated evils more grievous than those sought to be corrected. When the marriage relationship has completely and finally broken down and the relations of the parties have reached an impasse where reconciliation is impossible and the family unit has ceased to exist, no rule or regulation promulgated by authority of the state can restore it. The object of the state's protection has ceased to exist. Whether the fault be of one only or of both the parties, the result is the same. From that point on the best interest of society is served by a recognition of the ultimate fact and its consequences, not only upon the individuals involved but upon the community itself.

Our legislature has recognized the possibilities for harmful social consequences resulting from individuals living singly subject to the inhibitions of a marital tie which the law refuses to dissolve. In 1945 it added to the grounds for divorce in this state what is now section 32–610, I.C., providing that:

"When married persons have heretofore lived or shall hereafter live separate and apart for a period of five years or more without cohabitation, either party to the marriage contract may sue for a divorce which shall be granted on proof of the continuous living separate and apart without cohabitation of the spouses during said period of five years or more."

502

It is unnecessary for us here to adopt any so-called rule of "comparative rectitude", or to go to the extent that the California court did in the DeBurgh case. Here the question is squarely presented as to whether or not the acts and conduct of the plaintiff were such as to require the district judge to conclude that a cause of divorce was established in the defendant. While it is true that, standing alone, the court may have concluded that a cause was thus shown, he was not required by the facts to do so.

Appellant aslo assigns as error the failure of the trial court to allow her separate maintenance, attorneys' fees and suit money. The plaintiff did not seek and was not given any part of the community property, except an automobile which he sold, and applied the proceeds to expenses of a child or children of the marriage attending Whitman College. The home and the real estate and insurance business in California were left in the hands of the defendant, and it appears that she has ample funds for her needs.

Other assignments refer to rulings of the court sustaining objections to questions put to the plaintiff upon cross-examination. The objections were sustained on the ground that the questions sought to introduce purely defensive matter into the cross-examination. The order of proof is subject to the control of the trial judge. In the absence of prejudice his rulings thereon will be upheld. The defendant was permitted to, and did, fully develop the facts involved in these questions when the plaintiff was on the stand in rebuttal.

Judgment affirmed. Costs to respondent.

GIVENS, THOMAS and KEETON, JJ., concur.

PORTER, C. J., concurs in the conclusion reached.